# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**RITA WHITT,**

                    **Plaintiff,**

**-vs-**                                       **Case No.  6:11-cv-592-Orl-28GJK**

**SUNTRUST BANK,**

                    **Defendant.**

_____

## ORDER

Rita Whitt ("Plaintiff") brings the instant action against her former employer, SunTrust Bank ("Defendant"), alleging that Defendant discriminated and retaliated against her in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq. The case is currently before the Court on Defendant's Motion for Summary Judgment (Doc. 41), Plaintiff's Amended Memorandum in Opposition (Doc. 60), and Defendant's Reply (Doc. 62). Upon consideration of the record in this matter and pertinent law, the Court concludes that Defendant's motion must be granted as to both counts of Plaintiff's Amended Complaint.

### I.  Background

Plaintiff began her employment with Defendant in December 1980 as a Loan Clerk. (Pl. Dep.[1] at 48).  After progressing through several other positions including Lender, Sales Manager, Account Executive, and Assistant Branch Manager, in 2006 Plaintiff became the Branch Manager at Defendant's Clermont Main branch ("Clermont Main").  (Id. at 49-51).  At

---

[1]Defendant has submitted part of Plaintiff's deposition.  (Ex. 1 to Doc. 41).  Plaintiff has submitted the complete deposition, in three parts.  (Docs. 53-55).  Page citations are to the deposition page numbers rather than to the pages of the electronic record documents.

that point, Plaintiff began reporting to the Area Manager, Nancyann Bonafede, who in turn reported to the District Manager. (Id. at 65). For some time prior to May 2010, the District Manager was Larry Stewart; then, beginning in May 2010, Barbara James became the District Manager. (Id. at 66).

As the Branch Manager, Plaintiff supervised twelve to fourteen employees at Clermont Main. (Id.). These employees included an Assistant Branch Manager ("ABM"), Michele Isom; four sales staff members called Financial Services Representatives ("FSRs"); approximately five tellers; and a teller coordinator. (Id. at 66-68). In February 2010, Bonafede issued a Corrective Action Plan—also referred to as a "documented verbal warning"—to Plaintiff due to the failure of Clermont Main to reach 75% of sales goals for the fourth quarter of 2009. (Ex. 11 to Pl. Dep.; see also Pl. Dep. at 88). After Plaintiff was issued the Corrective Action Plan, she in turn issued Corrective Action Plans to the Assistant Branch Manager and some of the FSRs at Clermont Main. (Ex. 12 to Pl. Dep.; see also Pl. Dep. at 93-94).

In July 2010, one of the FSRs at Clermont Main, Johanna Rivas, transferred to Defendant's Fountains West branch, where she was supervised by Branch Manager Shawn Walters. (Rivas Decl., Ex. 3 to Doc. 41, ¶ 2; see also Pl. Dep. at 69). Walters required the Fountains West employees to report on their time records all of their time worked, which Rivas remarked to Walters was different from how Plaintiff had handled employee time reporting at Clermont Main. (Rivas Decl. ¶ 8). According to Rivas, when she worked at Clermont Main she regularly worked more than forty hours a week but did not record the hours above forty because Plaintiff stated that overtime was not allowed and would not be approved. (Id. ¶ 4). Additionally, Rivas stated that Plaintiff approved Rivas's timesheets

despite knowing that Rivas had not reported all of the time she had worked.  (Id.).

After Rivas mentioned the difference in time reporting at the two branches, Walters reported the matter to Defendant's Human Resources ("HR") Department.  (Id. ¶ 8; Mathisen Decl., Ex. 4 to Doc. 41, ¶ 3).  HR Advisor Wendy Mathisen then spoke to Rivas on July 12, 2010, about time reporting practices at Clermont Main, (Rivas Decl. ¶ 8; Mathisen Decl. ¶ 4), and based on that conversation Mathisen determined that it was necessary to conduct a Fair Labor Standards Act ("FLSA") Audit of Clermont Main, (Mathisen Decl. ¶ 5).

On July 16, 2010, Bonafede and Mathisen went to Clermont Main and met with Plaintiff regarding the FLSA Audit.  (Id. ¶ 6).  After interviewing Plaintiff, Mathisen interviewed several of the Clermont Main employees, and she returned on July 21 to interview the rest.  (Id. ¶¶ 8-9).  During the interviews with Mathisen, the tellers and the FSRs reported that they and the ABM were working more than forty hours per week, though the ABM denied working more than forty hours per week.[2]  (Id. ¶¶ 11-12).

In addition to employee interviews, the FLSA Audit included examination of video evidence of employees leaving Clermont Main as well as records of computer activity; this evidence was compared to the time records that had been submitted by the employees, and it corroborated the employees' reports of working more than forty hours per week.  (Id. ¶ 13).  Based on the interviews and evidence, Mathisen concluded that Plaintiff had not been truthful in her interview; that the FSRs and the ABM were not reporting overtime hours; that Plaintiff approved employees' time records even though she knew that the records did not reflect all

---

[2]All of the employees at Clermont Main except Plaintiff were non-exempt employees under the FLSA and thus were overtime-eligible.

of the hours they worked; and that the Clermont Main employees were fearful of and intimidated by Plaintiff, which is why they did not record overtime or complain.  (Mathisen Decl. ¶¶ 14, 17).

On July 28, 2010, Mathisen sent Bonafede and her supervisor, Area Manager Barbara James, an email explaining the discrepancies between the reported time and the camera evidence.  (Id. ¶ 15 & Ex. C thereto).  Bonafede responded in an email that same day, noting that there were "some major discrepancies" that "may warrant termination."  (Ex. C to Mathisen Decl.; Bonafede Decl., Ex. 2 to Doc. 41, ¶ 8 & Ex. A thereto).  Mathisen spoke to Plaintiff on July 28 or 29 about the evidence she had gathered, and Plaintiff placed the responsibility for time reporting on the employees and failed to acknowledge that there was a problem.  (Mathisen Decl. ¶ 16).

On Friday, July 30, 2010, Mathisen had a conference call with Bonafede and James about the findings from the FLSA Audit of Clermont Main.  (Mathisen Decl. ¶ 19; Bonafede Decl. ¶ 9; James Decl., Ex. 6 to Doc. 41, ¶ 5).  During that conference call, Bonafede recommended that Plaintiff be terminated for failure to ensure that Clermont Main was in compliance with the pay and overtime requirements of the FLSA; James approved Bonafede's recommendation, and Mathisen concurred.  (Mathisen Decl. ¶ 20; Bonafede Decl. ¶ 9; James Decl. ¶ 5).  The three also determined that the ABM, Michele Isom, should be issued a Final Written Warning for not being truthful during the FLSA Audit about the hours that she worked.  (Mathisen Decl. ¶ 20; Bonafede Decl. ¶ 9; James Decl. ¶ 5).  Bonafede, as Plaintiff's immediate supervisor, was asked to draft a written memorandum memorializing the recommendation to terminate Plaintiff and the Final Written Warning for Isom; Bonafede did

-4-

so that day and emailed the drafts to Mathisen and James at 6:01 p.m.  (Mathisen Decl. ¶¶ 20-21 & Ex. D thereto;  Bonafede Decl. ¶¶ 9-10 & Ex. B thereto;  James Decl. ¶¶ 5-6). Because Bonafede was going on vacation the following week, the three had decided to wait for Bonafede's return before informing Plaintiff and Isom of the decisions, (Mathisen Decl. ¶ 22; Bonafede Decl. ¶ 9; James Decl. ¶ 5); accordingly, Bonafede concluded her July 30 email by stating:  "I will return from vacation [on] August 9th[] and will be available to talk through our plan as to how best to complete the termination[] and delivery of the final [written warning] at that time."  (Ex. B to Bonafede Decl.).

However, Plaintiff was on vacation the week of August 9, and thus Plaintiff was not terminated upon Bonafede's return as planned.  (Mathisen Decl. ¶ 27; Bonafede Decl. ¶ 12; James Decl. ¶ 9).  The first available day to effect the termination was August 18, 2010, and on that date Bonafede and James met with Plaintiff and informed her that she was terminated.  (Mathisen Decl. ¶ 27; Bonafede Decl. ¶¶ 12-13; James Decl. ¶¶ 9-10).  Isom was issued the Final Written Warning that same day.  (Bonafede Decl. ¶ 13; James Decl. ¶ 10).

Two weeks earlier, on August 2, 2010, Plaintiff, through counsel, had emailed a copy of an EEOC charge of age discrimination dated July 30, 2010 to Mathisen.  (Mathisen Decl. ¶ 23; Ex. 3 to Mathisen Dep.).  In that charge, Plaintiff alleged that she had been issued the Corrective Action Plan in February 2010 because of her age.[3]  (See Ex. 3 to Mathisen Dep.). Plaintiff filed a second charge of discrimination on October 1, 2010, alleging retaliation for filing the first charge.  (Ex. 3 to Pl. Dep.).

---

[3]Plaintiff was fifty-four years old in July 2010.

Plaintiff filed this lawsuit in April 2011.  (Doc. 1).  In Count I of her Amended Complaint (Doc. 12), Plaintiff alleges that she was subjected to age-based discipline when she was issued the Corrective Action Plan in February 2010.  In Count II, Plaintiff alleges that she was terminated in retaliation for filing her first EEOC charge on August 2, 2010.  Defendant seeks summary judgment on both of these counts.

## II.  Summary Judgment Standards

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In ruling on a motion for summary judgment, the Court construes the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party.  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).  However, when faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." Gargiulo v. G.M. Sales, Inc., 131 F.3d 995, 999 (11th Cir. 1997).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative."  Sawyer v. Southwest Airlines Co., 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-51 (1986)).

"[A]t the summary judgment stage the judge's function is not himself to weigh the

evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.  "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.'"  Sawyer, 243 F. Supp. 2d at 1262 (quoting Anderson, 477 U.S. at 251-52); see also Laroche v. Denny's, Inc., 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").  "[T]he summary judgment rule applies in job discrimination cases just as in other cases.  No thumb is to be placed on either side of the scale."  Chapman v. AI Transp., 229 F.3d 1012, 1026 (11th Cir. 2000).

III.  The Merits of Defendant's Motion

A.  Discriminatory Discipline

The ADEA provides in part that it is "unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. § 623(a)(1).  Plaintiff alleges in her first claim that she was issued the Corrective Action Plan in February 2010 because of her age.

Plaintiff does not claim to have any direct evidence of age discrimination,[4] and thus the Court evaluates her discriminatory discipline claim using the burden-shifting framework established by McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and its progeny to determine if Plaintiff can establish her claim through circumstantial evidence.  Under this

---

[4](See Doc. 60 at 13-14).

three-part framework, the plaintiff in a disparate treatment case has the initial burden to establish a prima facie case of discrimination by a preponderance of the evidence. McDonnell Douglas, 411 U.S. at 802.  "Demonstrating a prima facie case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination."  Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997).  If the plaintiff establishes a prima facie case, a presumption of discrimination arises.  See, e.g., Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981).

If the plaintiff presents a prima facie case and its attendant presumption, the burden "[s]hifts to the employer to articulate some legitimate, nondiscriminatory reason" for its actions. McDonnell Douglas, 411 U.S. at 802.  The employer's "burden is one of production, not persuasion; it 'can involve no credibility assessment.'" Reeves, 530 U.S. at 142 (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993)).  "If the defendant articulates one or more such reasons, the presumption of discrimination is eliminated and 'the plaintiff has the opportunity to come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision.'" Chapman, 229 F.3d at 1024 (quoting Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997)).

An ADEA plaintiff may establish a prima facie case of age discrimination by showing: (1) that she was a member of the protected age group; (2) that she was qualified for her position; (3) that she was subjected to adverse employment action; and (4) that she was treated less favorably than a younger, similarly-situated comparator. East v. Clayton Cnty.,

-8-

Ga., 436 F. App'x 904, 911 (11th Cir. 2011).  Although Plaintiff's argument on her disparate treatment claim is sparse,[5] it is undisputed that Plaintiff was a member of the protected age group and that she was qualified for the Branch Manager position that she had held for more than three years at the time of the February 2010 Corrective Action; thus, the first two elements of the prima facie case are met here.   However, Plaintiff has not presented evidence or argument to support the third and fourth elements, and thus she has failed to establish a prima facie case of disparate treatment.

With regard to the third element, "not all conduct by an employer negatively affecting an employee constitutes adverse employment action."  Davis v. Town of Lake Park, 245 F.3d 1232, 1238 (11th Cir. 2001).  Instead, to be actionable, "the employer's action must impact the 'terms, conditions, or privileges' of the plaintiff's job in a real and demonstrable way."  Id. at 1239.  Thus, "to prove adverse employment action . . . an employee must show a *serious and material* change in the terms, conditions, or privileges of employment," and "the employee's subjective view of the significance and adversity of the employer's action is not controlling."  Id.

---

[5]The totality of the legal argument—aside from two case citations—on the disparate treatment claim in Plaintiff's amended summary judgment response memorandum reads as follows:

> In order to establish a prima facie case of age discrimination, a plaintiff must prove the following:  membership in a protected class, qualification for her position, an adverse employment action, and circumstances that support an inference of age discrimination.
>
> In the instant case, Plaintiff can establish a claim of disparate treatment. Disparate treatment occurs when an employee is treated less favorably simply because of a protected characteristic.

(Doc. 60 at 13-14).

There is no record evidence that the Corrective Action Plan amounted to "a serious and material change in the terms, conditions or privileges" of her employment.  Defendant has presented evidence that no such change occurred.  For example, Bonafede attests in her declaration that "[d]ocumented verbal warnings do not impact the employees' pay or benefits (and did not impact [Plaintiff's] pay or benefits in this case)."  (Bonafede Decl. ¶ 3). Moreover, the text of the verbal warning advises that a verbal warning does not affect an employee's eligibility for incentives.  (<u>See</u> Corrective Action Plan at 2).  Furthermore, Plaintiff's own deposition testimony belies a finding that the issuance of the Corrective Action Plan amounted to an adverse employment action.  Plaintiff acknowledged that after being issued the February 2010 Corrective Action Plan, she received a scheduled pay raise in March 2010; the amount of that raise might have been affected by the sales performance numbers—not the verbal warning itself—but she is not aware of whether even the sales performance numbers affected it. (Pl. Dep. at 90-91).  Plaintiff was not subjected to any other action regarding sales goals while she worked for Defendant, (<u>id.</u> at 91), and she has identified no monetary or other detriment that she suffered due to issuance of the documented verbal warning.  Without evidence of any serious and material consequences, there is no basis for the Court to conclude that mere issuance of the Corrective Action Plan to Plaintiff rises to the level of an adverse employment action.  Thus, Plaintiff has not established the third prima facie element of her disparate treatment claim.

Finally, even if Plaintiff had satisfied the adverse action prong, she also has failed to present evidence to meet the fourth element of the prima facie case—that a younger, similarly situated employee was treated more favorably.  Plaintiff testified in her deposition

that some of the other Branch Managers who reported to Bonafede were younger than forty, and "[i]t was [Plaintiff's] understanding [that] everybody was held to the [75 percent of sales] standards"; Plaintiff "assume[s]" that the Branch Managers under forty were also issued a verbal warning. (Pl. Dep. at 37-38).  She is not aware of any Branch Manager who failed to meet the 75% goal who was not also issued a verbal warning as she was. (Id. at 89-90).  In sum, Plaintiff takes issue with the level of Defendant's sales goals in a difficult economic climate, but she does not contest that she in fact did not meet those goals or that others—regardless of age—were held to the same standard.  Her prima facie case thus fails on the fourth element as well as the third.

Because Plaintiff has failed to present a prima facie case, her claim of age-based discriminatory discipline fails.[6]  Defendant is entitled to summary judgment on Count I of the Amended Complaint.

B.  Retaliation

---

[6]The same evidence that defeats Plaintiff's prima facie case would also defeat any assertion of pretext.  Plaintiff has acknowledged that all Branch Managers at underperforming branches under Bonafede were, regardless of age, issued documented verbal warnings.
Additionally, it appears that Plaintiff's disparate treatment claim is based only on the February 2010 Corrective Action Plan and not also on her termination; she alleges retaliatory termination but not age-based termination.  Even if Plaintiff had brought a disparate treatment claim based on her termination, it too would fail.  The third prima facie element—adverse action—would be satisfied, but the fourth element would not.  Plaintiff has not identified a similarly situated younger comparator who engaged in the same conduct that she did.  The ABM, Michele Isom, was under the age of forty, but she was an assistant manager rather than a manager.  Defendant has explained the difference in discipline—Plaintiff was the manager of the branch and was charged with ensuring accurate reporting of hours, and Isom was found to have underreported her own, overtime-eligible hours out of fear of Plaintiff.

Plaintiff also contends that she was terminated in retaliation for filing an EEOC charge alleging age discrimination.  The anti-retaliation provision of the ADEA provides in pertinent part that "[i]t shall be unlawful for an employer to discriminate against any of his employees or applicants for employment . . . because such individual . . . has opposed any practice made unlawful by this section."  29 U.S.C. § 623(d).  The retaliation claim is, like the age discrimination claim, appropriately analyzed under the McDonnell Douglas framework discussed earlier.

To make a prima facie showing of retaliation under the ADEA, a plaintiff must show: (1) that she engaged in statutorily protected activity; (2) that she suffered a materially adverse action; and (3) a causal connection between the two events.  Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006); Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993).  It is not disputed that Plaintiff was terminated; thus, the second prong of the prima facie case is satisfied.  Defendant does challenge Plaintiff's establishment of the first and third elements, however, and Defendant's arguments on these points are well-taken.

Clearly, filing a charge with the EEOC can constitute protected activity.  But, as part of establishing the protected activity element of the prima facie case, "a plaintiff must show that she 'had a good faith, reasonable belief that the employer was engaged in unlawful employment practices.'"  Weeks v. Harden Mfg. Corp., 291 F.3d 1307, 1312 (11th Cir. 2002) (quoting Little v. United Techs., Carrier Transicold Div., 103 F.3d 956, 960 (11th Cir. 1997)).  In other words, "[a] plaintiff must not only show that [s]he *subjectively* (that is, in good faith) believed that h[er] employer was engaged in unlawful employment practices, but also that h[er] belief was *objectively* reasonable in light of the facts and record presented."  Little, 103

-12-

F.3d at 960.

　　To the extent Plaintiff actually believed that she was issued a Corrective Action Plan in February 2010 because of her age, such a belief was not objectively reasonable.  As Plaintiff herself acknowledges, her branch did not meet sales goals, and managers of other underperforming branches were—regardless of age—issued Corrective Action Plans at that time as well.  (Pl. Dep. at 37-38).  Plaintiff in turn issued her subordinate employees Corrective Action Plans due to the subpar sales results.  (Id. at 92-93).  Plaintiff has not presented any evidence tending to show that Bonafede's issuance of the Corrective Action Plan to her was in any way related to her age.[7]  Thus, the "objectively reasonable" aspect of the protected activity element is not satisfied here, and Plaintiff fails to present a prima facie case of retaliation.

　　Even if Plaintiff had satisfied the first and second elements of a prima facie case, her retaliation claim would also fail on the third element—a causal connection between the filing of her EEOC complaint and her termination.  Although a short time lag between protected

[7]Indeed, Plaintiff does not even accuse Bonafede of having age-based animus.  In her deposition, the only persons Plaintiff identified as discriminating against her because of her age were James—who is older than she is—and possibly Mathisen.  (Pl. Dep. at 45-46, 137).  Plaintiff also testified, however, that James "had a power trip" and "just wanted to show her authority."  (Id. at 138).

　　Plaintiff does not contend that Bonafede or James's predecessor, Larry Stewart, who held the District Manager position when the February 2010 Corrective Action Plan was issued, acted with age-based animus.  (See id. at 46).  Plaintiff does claim that in January 2010 Bonafede remarked that Defendant "was really looking to get rid of some of the older employees in the company."  (Id. at 24-25).  Plaintiff believed that this was Bonafede's personal feeling, and Plaintiff thought that Bonafede herself felt vulnerable to age discrimination.  (Id. at 25, 27, 46).  Bonafede denies making this remark, but even assuming that it was made, Plaintiff has not tied it to any adverse action; it does not suffice to state an actionable claim under the ADEA.

-13-

activity and adverse action can be enough to satisfy the causal connection element, other circumstances can negate the inference of causation that may arise from temporal proximity. See Hankins v. AirTran Airways, Inc., 237 F. App'x 513, 520 (11th Cir. 2007) (noting that "close temporal proximity between two events, standing alone, is not a panacea, absent any other evidence that the employment decision was causally related to the protected activity").

Two weeks before Plaintiff filed her EEOC charge, Defendant began the FLSA audit of Plaintiff's branch. Moreover, the record evidence shows that the decision to terminate Plaintiff had been made on July 30, and Defendant did not receive notice of Plaintiff's EEOC charge until August 2. As the Eleventh Circuit has stated in the Title VII context, "anti-retaliation provisions do not allow employees who are already on thin ice to insulate themselves against termination or discipline by preemptively making a discrimination complaint." Alvarez v. Royal Atl. Developers, Inc., 610 F.3d 1253, 1270 (11th Cir. 2010). The record establishes that, at a minimum, Defendant "had legitimate non-[retaliatory] reasons to fire [Plaintiff] before she complained, and it remained free to act on those reasons afterward."[8] Id.

Even assuming that Plaintiff had set forth a prima facie case of retaliatory termination, Defendant has articulated a legitimate, nonretaliatory reason for terminating Plaintiff—that

---

[8]Moreover, Defendant has presented extensive evidence that the termination decision had in fact already been made before Defendant learned that Plaintiff had filed an EEOC charge. Plaintiff has not impeached this evidence in any fashion other than by conclusorily suggesting that all of Defendant's documents as to the date of the decision could be "false or doctored." (See Doc. 60 at 18). As noted in the text, the fact that the reason to terminate existed prior to receipt of the EEOC charge is sufficient, in any event, to sever the causal connection that could otherwise be inferred from temporal proximity.

Plaintiff did not ensure that hours worked were accurately reported at Clermont Main.  Thus, Defendant is entitled to summary judgment unless Plaintiff presents evidence creating a genuine issue of material fact regarding whether Defendant's asserted reason is a mere pretext for retaliation.  See, e.g., Chapman, 229 F.3d at 1024-25 ("If the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claim.").

In determining whether an issue has been raised as to pretext, this Court "must, in view of all the evidence, determine whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered legitimate reasons were not what actually motivated its conduct."  Combs, 106 F.3d at 1538 (citation and internal quotation omitted).  This determination involves an "evaluat[ion of] whether the plaintiff has demonstrated 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'"  Id. (quoting Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1072 (3d Cir. 1996)).  "The inquiry into pretext centers upon the employer's beliefs, and not the employee's own perceptions of [her] performance."  Holifield, 115 F.3d at 1565.

Applying these standards, Plaintiff has failed to present evidence creating a genuine issue of material fact regarding whether Defendant's reason for terminating her was a pretext for retaliation.  See Tidwell v. Carter Prods., 135 F.3d 1422, 1427 (11th Cir. 1998) (finding

no issue raised as to pretext where evidence presented did "not provide the needed 'more than a mere scintilla of evidence' to survive a motion for judgment as a matter of law" and did "not present a substantial conflict in the evidence as to [the employer's] purported reason for terminating [the plaintiff] . . . as to support a jury question").

Plaintiff generally argues that inconsistencies in the evidence can support a finding of pretext, (see Doc. 60 at 16), but she does not identify any such inconsistencies in support of this argument.  She also refers generally to "failure to follow a progressive discipline policy" as being potentially probative of pretext.  (See id. at 17).  The Court assumes that Plaintiff is suggesting that she should have received a lesser sanction than termination for the FLSA issue at Clermont Main.  However, the Court cannot fault Defendant for holding Plaintiff, as the Branch Manager, responsible for time reporting problems at her branch, especially considering the possible ramifications to Defendant of overtime violations.  Cf. Michaelson v. Waitt Broad., Inc., 187 F. Supp. 2d 1059, 1072 (N.D. Iowa 2002) (noting that plaintiff, the general sales manager for a television station, "was in charge of the entire sales force" and "was the person responsible for developing and implementing viable sales strategies as well as hiring and training a sales staff," and thus "[t]he downturn in advertising sales . . . could reasonably be attributed to some failing on his part").  Indeed, second-guessing of an employer's decisions is especially inappropriate when the employee is a manager; an employer is entitled to require more from such an employee and to determine for itself whether any performance deficiencies are remediable and what action is appropriate.  Cf. id. (noting that "[c]ourts have held that an employer is justified in holding management to a higher standard of performance"); accord Gaston v. Home Depot USA, Inc., 129 F. Supp. 2d

1355, 1371 (S.D. Fla. 2001).

Finally, Plaintiff argues that "Defendant's entire termination action rests not only on multiple hearsay . . . but also on credibility." (Doc. 60 at 17). Plaintiff asserts that for Defendant to prevail, the Clermont Main employees who were interviewed by Mathisen "must testify and must be believed by the jury." (Id.) (emphasis removed). However, this is incorrect. The relevant question is not whether the interviewed employees were truthful in their statements during the FLSA Audit but whether Defendant had an honest belief in the basis for termination, and Plaintiff has not presented evidence showing that Defendant's decisionmakers did not honestly believe that the FLSA reporting problems were occurring at Clermont Main. See Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1363 n.3 (11th Cir. 1999) ("An employer who fires an employee under the mistaken but honest impression that the employee violated a work rule is not liable for discriminatory conduct."); Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991) ("'[N]o matter how mistaken the firm's managers, the ADEA does not interfere. [The court's] inquiry is limited to whether the employer gave an honest explanation of its behavior.'" (quoting Mechnig v. Sears, Roebuck & Co., 864 F.2d 1359, 1365 (7th Cir. 1988))); cf. EEOC v. Total Sys. Servs., Inc., 221 F.3d 1171, 1176 (11th Cir. 2000) ("When an employer is told of improper conduct at its workplace, the employer can lawfully ask: is the accusation true? When the resulting employer's investigation . . . produces contradictory accounts of significant historical events, the employer can lawfully make a choice between the conflicting versions—that is, to accept one as true and to reject one as fictitious—at least, as long as the choice is an honest choice.").

Plaintiff acknowledges that either Bonafede or James or both made the decision to terminate her after being told by Mathisen of the results of the FLSA Audit.  Absent evidence to challenge the honest belief of the decisionmaker(s) as to her conduct, Plaintiff fails to create a triable issue as to pretext.  See Weston-Smith v. Cooley Dickinson Hosp., Inc., 282 F.3d 60, 70 (1st Cir. 2002) (affirming summary judgment for employer, noting that the "proffered reasons for [the plaintiff's] termination are plausible and coherent, and neither [the plaintiff's] criticisms of those reasons nor her independent circumstantial evidence of an improper motive, whether taken apart or together, are sufficient to require a jury trial").

Defendant's motion for summary judgment shall be granted as to Count II.

### IV.  Conclusion

In accordance with the foregoing, it is **ORDERED** and **ADJUDGED** as follows:

1.  Defendant's Motion for Summary Judgment (Doc. 41) is **GRANTED**.

2.  All other pending motions are **DENIED as moot**.

3.  The Clerk is directed to enter a judgment providing that Plaintiff shall take nothing on any of her claims against Defendant.  Thereafter, the Clerk shall close this case.

**DONE** and **ORDERED** in Orlando, Florida this 10th day of December, 2012.

JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record